Approved: _____
ELI J. MARK
Assistant United States Attorney

U.S. DISTRICT COURT
FILED
SEP 28 2017
S.D. OF N.Y.

17 MAG    7241

Before:    THE HONORABLE JAMES L. COTT
United States Magistrate Judge
Southern District of New York

- - - - - - - - - - - - - - - - - - - - X
                                        :    SEALED COMPLAINT
UNITED STATES OF AMERICA                :
                                        :    Violations of
       - v. -                           :    18 U.S.C. §§ 666,
                                        :    1341, 1343, 1512
MAMDOUH ABDEL-SAYED,                    :
                                        :    COUNTY OF OFFENSE:
                    Defendant.          :    NEW YORK
                                        :
- - - - - - - - - - - - - - - - - - - - X

SOUTHERN DISTRICT OF NEW YORK, ss.:

        VICTORIA CRESSMAN, being duly sworn, deposes and says
that she is a Special Agent with Department of Education, Office
of the Inspector General ("ED-OIG"), and charges as follows:

## COUNT ONE
### (Conversion and Misapplication
### Concerning Program Receiving Federal Funds)

        1.    From in or about at least 2013 through in or
about 2017, in the Southern District of New York and elsewhere,
MAMDOUH ABDEL-SAYED, the defendant, being an agent of an
organization that received benefits in excess of $10,000 of
federal grants and financial aid each year between 2013 and
2017, to wit, The City University of New York, Medgar Evers
College ("Medgar Evers College" or "the College"), embezzled,
stole, obtained by fraud, and otherwise without authority
knowingly converted to the use of a person other than the
rightful owner, and intentionally misapplied, property worth at
least $5,000 and owned by such organization, to wit, ABDEL-
SAYED, without authorization from Medgar Evers College,
misappropriated property belonging to Medgar Evers College,
including, among other things, facilities, the name of the
College, and course fees in connection with ABDEL-SAYED's
teaching of unauthorized medical and health-care related courses
at the College, and his issuance and sale of unauthorized

certificates representing completion of the courses at Medgar
Evers College.

(Title 18, United States Code, Section 666(a)(1)(A) and 2.)

## COUNT TWO
### (Solicitation of Bribes)

2.    From in or about at least 2013 through in or
about 2017, in the Southern District of New York and elsewhere,
MAMDOUH ABDEL-SAYED, the defendant, being an agent of an
organization that received benefits in excess of $10,000 of
federal grants and financial aid each year between 2013 and
2017, to wit, Medgar Evers College, corruptly solicited and
demanded for the benefit of a person, and accepted and agreed to
accept, a thing of value from a person, intending to be
influenced and rewarded in connection with a business,
transaction, and series of transactions of such organization
involving a thing of value of $5,000 and more, to wit, ABDEL-
SAYED, without authorization from Medgar Evers College,
solicited students to participate in and pay for medical and
health-care related courses at Medgar Evers College, in exchange
for which the students received unauthorized certificates
representing completion of those courses at Medgar Evers
College.

(Title 18, United States Code, Section 666(a)(1)(B) and 2.)

## COUNT THREE
### (Wire Fraud)

3.    From in or about 2013 through in or about 2017,
in the Southern District of New York and elsewhere, MAMDOUH
ABDEL-SAYED, the defendant, willfully and knowingly having
devised and intending to devise a scheme and artifice to
defraud, and for obtaining money and property by means of false
and fraudulent pretenses, representations, and promises, would
and did transmit and cause to be transmitted by means of wire
and radio communication in interstate and foreign commerce,
writings, signs, signals, pictures, and sounds for the purpose
of executing such scheme and artifice, in violation of Title 18,
United States Code, Section 1343, to wit, ABDEL-SAYED sent
emails to students falsely claiming that health-care related
courses he taught were sponsored and sanctioned by Medgar Evers
College, and sent emails falsely attesting to a medical staffing
company that certificates of completion for health-care related

2

courses that he created and issued to students/job applicants were authorized and issued by Medgar Evers College.

(Title 18, United States Code, Section 1343 and 2.)

## COUNT FOUR
### (Mail Fraud)

4.    From in or about February 2017 through in or about June 2017, in the Southern District of New York and elsewhere, MAMDOUH ABDEL-SAYED, the defendant, willfully and knowingly, having devised and intending to devise a scheme and artifice to defraud, and for obtaining money and property by means of false and fraudulent pretenses, representations and promises, for the purpose of executing such scheme and artifice and attempting so to do, would and did place in a post office and authorized depository for mail matter, a matter and thing to be sent and delivered by the Postal Service, and would and did take and receive therefrom, such matter and thing, and would and did knowingly cause to be delivered by mail according to the direction thereon, and at the place at which it is directed to be delivered by the person to whom it is addressed, a matter and thing, to wit, ABDEL-SAYED caused money orders to be sent and received through the United States Postal Service for the purpose of paying for health-care related courses and certificates of completion that ABDEL-SAYED falsely claimed were authorized by Medgar Evers College.

(Title 18, United States Code, Section 1341 and 2.)

## COUNT FIVE
### (Obstruction of Justice)

5.    In or about July 2017, in the Southern District of New York and elsewhere, MAMDOUH ABDEL-SAYED, the defendant, and others known and unknown, knowingly used intimidation, threatened, and corruptly persuaded another person, and attempted to do so, and engaged in misleading conduct toward another person, with intent to hinder, delay, or prevent the communication to a law enforcement officer or judge of the United States of information relating to the commission or possible commission of a Federal offense, and aided and abetted such conduct, to wit, ABDEL-SAYED instructed an undercover law enforcement official to provide false information to federal law enforcement agents investigating ABDEL-SAYED's participation in selling sham certificates of completion for health-care related courses that purportedly were authorized by Medgar Evers

College, and to conceal those certificates from the investigating agents.

(Title 18, United States Code, Section 1512(b)(3) and 2.)

The bases for my knowledge and for the foregoing charges are, in part, as follows:

## OVERVIEW

6.    I am a Special Agent with the United States Department of Education Office of Inspector General ("ED-OIG"), and have been in that position for approximately six years. Along with criminal investigators and auditors with the State of New York Office of Inspector General ("NYS-OIG"), I have been personally involved in the investigation of this matter, and I base this affidavit on that experience, on my conversations with other law enforcement officials, and on my examination of various reports, consensual recordings, draft transcripts of those recordings, and other records. Because this affidavit is being submitted for the limited purpose of demonstrating probable cause, it does not include all the facts I have learned during the course of my investigation. Where the contents of documents and the actions, statements, and conversations of others are reported herein, they are reported in substance and in part, except where otherwise indicated.

7.    As set forth in more detail below, there is probable cause to believe that MAMDOUH ABDEL-SAYED, the defendant, has engaged in a scheme to defraud Medgar Evers College by, among other things, depriving the College of the fees paid by students for health-care related courses that the students believed were sponsored and sanctioned by the College, and by converting the name of the College and using some of its classroom facilities for his own financial benefit.

8.    Specifically, there is probable cause to believe that MAMDOUH ABDEL-SAYED, the defendant, while employed as a full-time Lecturer in the Biology Department by Medgar Evers College, conducted unauthorized courses ("Unauthorized Courses") at the College on certain health-care related topics, classes for which ABDEL-SAYED charged fees ranging from $25 to over $1,000, which fees he converted to his own use. Many of the Unauthorized Courses were offered by ABDEL-SAYED in direct competition with authorized classes offered by the College, which cost significantly more than the fees charged by ABDEL-SAYED.

4

9. As part of his scheme, MAMDOUH ABDEL-SAYED, the defendant, issued certificates to students that bore the College's name and logo, and which purported to represent the successful completion of the health-care related courses at the College ("Unauthorized Certificates"). In truth and in fact, however, the Unauthorized Certificates were printed by ABDEL-SAYED on his computer, using paper and paraphernalia he purchased from an office supply store, and were issued by ABDEL-SAYED without the College's knowledge or authorization. In addition, the investigation has revealed that ABDEL-SAYED provided little training in connection with the Unauthorized Courses, and also would issue Unauthorized Certificates to students even if they did not attend his courses, so long as they paid his fee. Moreover, despite knowing that the Unauthorized Certificates were a sham, and often were provided to students who did not attend any courses, ABDEL-SAYED encouraged students to utilize and rely upon the Unauthorized Certificates to obtain employment in the medical and health-care industry. Indeed, when students presented the Unauthorized Certificates to medical staffing companies in order to obtain employment, ABDEL-SAYED falsely verified to the medical staffing agencies that the Unauthorized Certificates were issued by Medgar Evers College.

10. In total, MAMDOUH ABDEL-SAYED, the defendant, taught dozens of Unauthorized Courses at Medgar Evers College during the charged period. Based on my participation in this investigation, I am aware that attendance at each Unauthorized Course sometimes exceeded thirty students, and that ABDEL-SAYED charged fees ranging from $25 to over $1,000 to each student for certificates he issued in connection with those courses.

11. After MAMDOUH ABDEL-SAYED, the defendant, became aware of the federal investigation, he attempted to destroy and conceal evidence, and directed an undercover law enforcement official to lie to government investigators.

## RELEVANT PARTIES

### A. Medgar Evers College

12. Medgar Evers College is a college of the City University of New York ("CUNY") located in Brooklyn, New York. The College awards degrees and certificates through three academic schools, and a fourth non-academic school, the School of Professional and Community Development. According to the

investigation and the College's course catalog, the mission of the School of Professional and Community Development includes supporting and enriching the professional development of adults, and enhancing skills needed for new career opportunities through Adult and Continuing Education ("ACE").

13.    According to my review of course catalogs for ACE and interviews with current and former College administrators, I have learned that the College's ACE program provides non-credit certificate programs and courses and workshops in multiple areas, including health care.  Among others, ACE courses include (i) Patient Care Technician ("PCT"), which prepares a student to be an entry-level medical technician in a clinic, hospital, wound care center, or long-term care facility; (ii) Phlebotomy, which trains students in the practice of drawing blood from patients for medical or clinical testing; (iii) Electrocardiogram ("EKG"), which trains students regarding cardiovascular anatomy and physiology, and the use of electrodes and other specialized electronic equipment to obtain heart readings; (iv) Cardiopulmonary Resuscitation ("CPR"), which instructs healthcare providers on the American Heart Association's CPR techniques; and (v) Certified Nursing Assistant, which prepares a student to provide assistance to patients with daily tasks, including feeding, bathing, personal hygiene.  ACE charges between $85 for a one-day CPR class to $495 for a 27-hour course on Phlebotomy or EKG to $2,530 for a 200-hour PCT class.  Students completing such classes are provided with certificates of completion from the College.[1]

14.    Any class taught at Medgar Evers College has to be authorized by representatives of the College.  Medgar Evers College schedules classes for a particular date and time each

---

[1] Based on my participation in this investigation, and interviews with current and former College administrators, I have learned that the medical and health-care industry is a significant growth industry, and has been a focus of ACE programs throughout the country.  Like most states, New York imposes regulations on medical assistants who operate under the supervision of a licensed medical professional (e.g., a Doctor of Medicine, Physician's Assistant or Registered Nurse), and who provide assistance to patients with routine medical tasks, such as drawing blood, performing EKGs and Sonograms.  Certificates of completion in these medical techniques are frequently required and relied upon by employers, including hospitals, doctor's offices and others in hiring individuals that they believe are qualified to fill medical assistant positions.

semester, and students sign up for the classes and pay to attend the classes through the College.  Medgar Evers College does not permit its faculty and staff to teach courses for compensation on its premises that have not been authorized previously by the College.

15.  I am aware, through publicly available information and information contained in U.S. Department of Education databases, that at all times relevant to this Complaint, both CUNY and the College received in excess of $10,000 per year in aid from the federal government.  For example, from 2014 to the Present, the College has received approximately more than $75 million in funds from the U.S. Department to Education.

### B. MAMDOUH ABDEL-SAYED

16.  Through my investigation, which has included searching publicly available sources and law enforcement databases, and reviewing documents from CUNY and other sources, I have learned the following about MAMDOUH ABDEL-SAYED, the defendant:

a.  ABDEL-SAYED holds a Master of Science in Pharmacology from St. John's University and a Medical Degree from a medical school in Egypt.

b.  ABDEL-SAYED has been employed at Medgar Evers College from approximately 1995 through the present.  At the College, ABDEL-SAYED teaches in the Biology Department of the School of Science, Health and Technology.  ABDEL-SAYED initially taught biology courses as an adjunct lecturer; in 2007, he was appointed as a full-time Lecturer in the Department of Biology.  Among other courses, ABDEL-SAYED has taught Human Anatomy and Physiology, and Pathophysiology.

17.  I have interviewed current and former members of the Medgar Evers College administration.  From these interviews and my review of documents provided by CUNY, I have learned the following about the activities of MAMDOUH ABDEL-SAYED, the defendant, during his time working for the College:

a.  In connection with ABDEL-SAYED's employment as a full-time faculty member at Medgar Evers College, he had to complete a "Multiple Position Report" certifying whether he had any compensated or uncompensated employment, or other work, in addition to his regular full-time employment at the College.

Based on my review of Multiple Position Reports provided by Medgar Evers College, at least since the semester of Fall 2011, ABDEL-SAYED has certified that he had no outside employment. The last Multiple Position Report provided by Medgar Evers College for ABDEL-SAYED is for Fall 2015 semester.

        b.    ABDEL-SAYED has never been authorized to teach for compensation any classes on behalf of the College in EKG, Phlebotomy, CPR, PCT and Sonography,[2] or to issue certificates on behalf of the College representing completion of those courses.

### The Scheme

### A.    The Defendant's Unauthorized Courses at the College

        18.    Based on my participation in this investigation, including interviews of current and former College administrators and faculty, students who attended the Unauthorized Courses offered by MAMDOUH ABDEL-SAYED, the defendant, and received ABDEL-SAYED's Unauthorized Certificates, and review of records obtained from CUNY, including ABDEL-SAYED's College email account, I have learned that ABDEL-SAYED taught several Unauthorized Courses at the College, using College facilities, and that such courses did not meet the standard of instruction and training as the same courses offered by the College. In particular:

        a.    Despite not being authorized by the College to do so, ABDEL-SAYED taught classes at the College on various medical techniques, including EKGs, Phlebotomy, CPR, and Sonography. Some of these classes were attended by more than thirty students at a time.

        b.    ABDEL-SAYED had an office at the College and he would advertise these medical courses on his office door, although he would not list any prices for the courses.

        c.    ABDEL-SAYED frequently would host the Unauthorized Courses in vacant classrooms at the College on dates and times when the College was less crowded, including on weekends and/or evenings. Even after the College's security officers advised ABDEL-SAYED not to use the College's classrooms for unscheduled classes he continued to do so.

---

[2] The College does not offer a Sonography class.

8

d.    ABDEL-SAYED informed students that some of the courses were free, but that they would have to pay if they wanted to obtain the Unauthorized Certificates representing successful completion of the courses.    ABDEL-SAYED charged students between $25 and $1,000 for these certificates, which students paid directly to him or his assistant ("Assistant-1"). Assistant-1 was a former student of ABDEL-SAYED's at the College, and was not an employee of Medgar Evers College.

e.    ABDEL-SAYED informed students that certain Unauthorized Certificates served as prerequisites for other certificates, which students could purchase for additional fees paid directly to ABDEL-SAYED.    Thus, for example, ABDEL-SAYED informed students that if they had purchased Unauthorized Certificates for his EKG, Phlebotomy and CPR programs, then the students were eligible to purchase PCT certificates or Medical Assistant certificates.

f.    As part of the purported training provided by ABDEL-SAYED in exchange for his fees, ABDEL-SAYED conducted unsanitary and risky procedures in the College's classrooms. For example, in his Phlebotomy class, ABDEL-SAYED passed out needles and suggested that students could attempt to draw blood from each other.    In his Sonogram class, ABDEL-SAYED invited students to volunteer to lie down so that other students could practice examining them using an Ultrasound machine.    ABDEL-SAYED would then wipe down the machine with a paper towel before permitting other students to volunteer to be imaged.

## B.    The Defendant Created and Sold Sham Certificates of Completion from Medgar Evers College to Students Taking His Unauthorized Courses

19.    Based on my participation in this investigation, including my review of documents obtained pursuant to a judicially-authorized search warrant and through subpoenas, and interviews of current and former students who attended the Unauthorized Courses offered by MAMDOUH ABDEL-SAYED, the defendant, and received ABDEL-SAYED's Unauthorized Certificates, I have learned the following about the Unauthorized Certificates:

a.    ABDEL-SAYED charged students from $25 to more than $1,000 to obtain an Unauthorized Certificate, depending on the course.    The Unauthorized Certificates purported to represent that the student successfully completed training in the medical technique for which the certificate was

issued.   Students received the Unauthorized Certificates directly from ABDEL-SAYED.

  b.   The Unauthorized Certificates strongly resembled the certificates issued by the College through ACE for the exact same classes.  In particular, ABDEL-SAYED's Unauthorized Certificates included the name of the College and the CUNY logo, and bore a raised seal.  The Unauthorized Certificates were signed by ABDEL-SAYED as a purported representative of the College.  An example of one such certificate (with the student's name redacted) is attached hereto as Exhibit A.

  c.   ABDEL-SAYED informed students – including via email – that Unauthorized Certificates were issued by Medgar Evers College/CUNY and could help students obtain internships, placement into nursing programs, and employment.  For example, on July 18, 2016, ABDEL-SAYED emailed one interested student that "the certificates are coming from MEC/CUNY[] and most of the people they get it they work with it either in NY, NY [sic], NC, MD, CA, and all other states."

  d.   ABDEL-SAYED issued the Unauthorized Certificates to students who received minimal to no training in the medical technique for which the certificate was issued, as described above.  ABDEL-SAYED's Unauthorized Courses did not have a textbook and were not graded.

  20.   Based on my participation in this investigation, including records obtained from an office supply store ("Store-1"), I have learned that between February 2014 and June 2017, a customer, whom I believe to be MAMDOUH ABDEL-SAYED, the defendant, purchased, among other things, office supplies sufficient to create more than 7,000 Unauthorized Certificates:

  a.   On numerous occasions between and including February 2014 and June 2017, a customer named "Mamdouh AbdelSayed" purchased, in total, more than 7,000 blank 8" x 11.5" certificates and award seals/stickers that are consistent with the certificates and seals/stickers I have observed on Unauthorized Certificates that I have reviewed.

  b.   Store-1's records reflect that the customer named "Mamdouh AbdelSayed" has an email address that I know from my participation in this investigation is used by ABDEL-SAYED.

C.    **ABDEL-SAYED Deceived Students' Potential Employers
Regarding the Unauthorized Certificates**

21.    Based on my participation in this investigation, including records obtained from CUNY and a medical staffing agency based in Manhattan ("Staffing Company-1"), and conversations with a staffing recruiter for Staffing Company-1, I have learned the following, among other things:

a.    Staffing Company-1 recruits and helps assist with job placement for a wide range of health care positions, including medical assistants and phlebotomists, among others. In order to ensure that health professionals they assist in staffing are skilled, experienced, and properly credentialed, Staffing Company-1 will prescreen applicants, conduct background checks, and obtain license/credential and educational verifications.

b.    Staffing Company-1 conducts job fairs and solicits applicants at its job fairs, which advertise jobs with some of the most prestigious hospitals and medical facilities in the New York City-area. Staffing Company-1 has emailed MAMDOUH ABDEL-SAYED, the defendant, regarding these job opportunities, and ABDEL-SAYED has encouraged students to whom he has issued Unauthorized Certificates to obtain employment through Staffing Company-1.

c.    Several of ABDEL-SAYED's former students in his Unauthorized Courses applied for jobs with Staffing Company-1. These students listed on their resumes having obtained certificates from Medgar Evers College in the Unauthorized Courses, and presented to Staffing Company-1 copies of the Unauthorized Certificates as proof of the students' completion of the course. In connection with the staffing placement process, Staffing Company-1 often requested verification of these certificates from ABDEL-SAYED as a representative of Medgar Evers College, which verification ABDEL-SAYED falsely provided. Some of these false verifications were sent by ABDEL-SAYED via email to Staffing Company-1.[3] However, as discussed

---

[3] I have been informed by a representative of Staffing Company-1 that all of Staffing Company-1's email servers are located in Herndon, Virginia. Based on my participation in this investigation and training and experience, therefore, I believe that any emails between ABDEL-SAYED and representatives of Staffing Company-1 regarding verification of the Unauthorized

herein, ABDEL-SAYED was not authorized by the College to issue the Unauthorized Certificates and those certificates were not in fact legitimately issued by the College.  For example,

    i.  Student-1 listed on her resume that she obtained certificates from the College in EKG, CPR, Phlebotomy, Medical Assistant and PCT in or about September 2016.  On or about November 3, 2016, Student-1 presented them to Staffing Company-1 for visual inspection in support of her application for a job.  Each of the certificates presented by Student-1 was an Unauthorized Certificate issued by ABDEL-SAYED.  Student-1 subsequently obtained employment with two hospitals in New York City through Staffing Company-1.

    ii.  Student-2 listed on her resume that she obtained certificates in EKG, Phlebotomy and PCT in or about January and February 2016.  On or about February 11, 2016, Student-2 presented the certificates to Staffing Company-1 for visual inspection in support of her application for a job. Each of the certificates presented by Student-2 was an Unauthorized Certificate issued by ABDEL-SAYED. Student-2 subsequently obtained employment with two hospitals in New York City through Staffing Company-1.

    iii.  Student-3 listed on his resume that he obtained certificates in EKG, Phlebotomy, Medical Assistant, PCT, CPR and Patient Care Assistant ("PCA") from the College. On or about November 3, 2016, Student-3 presented these certificates to Staffing Company-1 for visual inspection in support of his application for a job.  Each of the certificates was an Unauthorized Certificate issued by ABDEL-SAYED.

    iv.  Student-4 listed on her resume that she obtained certificates in EKG, Phlebotomy and PCT from the College.  On or about April 7, 2017, Staffing Company-1 requested ABDEL-SAYED, via email, to verify whether Student-4 obtained certificates in EKG, Phlebotomy and PCT from the College.  On or about April 11, 2017, ABDEL-SAYED emailed Staffing Company-1, informing it that he had faxed a verification form regarding those courses to Staffing Company-1. ABDEL-SAYED signed the faxed verification form as a representative of the College, and affirmed that Student-4 had obtained those course certificates from the College in September 2016.

---

Certificates traveled through those Virginia-based email servers.

v.      Student-5 listed on her resume that she received training in PCA, Medical Assistant, CPR, EKG, and Phlebotomy from the College.  On or about December 9, 2016, ABDEL-SAYED verified to Staffing Company-1 that Student-5 obtained certificates in PCA, EKG, and Phlebotomy in October 2016 from the College.  Student-5 subsequently obtained employment with two hospitals in New York City through Staffing Company-1.

vi.      On or about May 11, 2017, Staffing Company-1 requested ABDEL-SAYED, via email, to verify whether Student-6 obtained EKG and Phlebotomy certificates from the College.  The verification request included copies of Unauthorized Certificates issued by ABDEL-SAYED to Student-6 for successful completion of training in EKG and Phlebotomy (which were apparently presented by Student-6 to Staffing Company-1 for inspection in connection with a job application).  The fax cover sheet of the verification request also informed ABDEL-SAYED that Student-5 "is expected to start an assignment pending this verification," so Staffing Company-1 wanted the verification sent "back ASAP."  On or about May 11, 2017, ABDEL-SAYED signed the verification request form as a representative of the College and affirmed to Staffing Company-1 that Student-6 had obtained those course certificates from the College.  Student-6 subsequently obtained employment with a hospital in New York City through Staffing Company-1.

vii.      Student-7 represented to Staffing Company-1 that she obtained certificates in EKG, Phlebotomy, and Medical Assistant from the College.  On July 25, 2017, Staffing Company-1 requested ABDEL-SAYED, via email, to verify whether Student-1 obtained EKG, Phlebotomy, and Medical Assistant Certificates from the College.  The same date, ABDEL-SAYED responded via email to Staffing Company-1 to confirm that Student-7 had received from the College the EKG and Phlebotomy certificates in October 2013, and the Medical Assistant certificate in December 2014. ABDEL-SAYED signed the requested verification form as a representative of the College.

22.    Based on my participation in this investigation, including records obtained from CUNY and other medical staffing companies, I have learned, among other things, that former students of MAMDOUH ABDEL-SAYED, the defendant, also presented Unauthorized Certificates to medical staffing companies other than Staffing Company-1, in the expectation of obtaining employment.  At times, representatives of these medical staffing

13

companies contacted other employees of the College, and were
informed that the College was not able to verify the
certificates.

   **D.    ABDEL-SAYED Continued to Issue Unauthorized**
        **Certificates After Receiving A Cease and Desist Letter**
        **from the College**

        23.    Based on my participation in this investigation,
conversations with current and former College administrators,
and review of CUNY records, I have learned, the following, among
other things:

        a.    In approximately 2015, the Director of the
College's ACE Program (the "ACE Director") informed the
College's administration, including the College's Provost
("Provost"), that ACE had received a request for verification
for one of the Unauthorized Certificates issued by MAMDOUH
ABDEL-SAYED, the defendant, and was unable to provide
verification since, despite bearing the name of the College and
resembling certificates issued by ACE, it had not been issued by
the College.  The ACE Director also informed the College that
ACE "periodically" received verification requests from employers
for Unauthorized Certificates issued by ABDEL-SAYED.

        b.    After the Provost learned of the
Unauthorized Certificates issued by ABDEL-SAYED, he referred the
matter to the College's Executive Legal Counsel ("Counsel").

        c.    In August 2015, Medgar Evers College's
Counsel instructed ABDEL-SAYED to cease and desist running
unauthorized phlebotomy classes at Medgar Evers College.
Specifically, in an email dated August 25, 2015, Counsel
informed ABDEL-SAYED that:

                The [C]ollege understands that you have been
                teaching an unofficial, unauthorized phlebotomy
                program, as reflected in the attached
                'certificate of completion.' I am directing you
                to immediately cease this activity and not to
                engage in any similar activity in the future
                without approval of either the University [CUNY]
                or the College.... [B]y holding this activity out
                as an authorized activity of the College, you may
                have exposed the College to liability in regard
                to students who have acted in detrimental
                reliance on any representations you have made to

them.  The College reserves the right to take
appropriate disciplinary action in regard to this
activity.

d.  As described herein, despite the August 2015
cease and desist email, ABDEL-SAYED has continued to teach the
Unauthorized Courses at the College, issue the Unauthorized
Certificates, and solicit receive payments from students for
those certificates.  When confronted by College faculty,
including as late as September 2016, ABDEL-SAYED denied that he
received payments from students for these classes, and further
informed the College that he would no longer offer the courses.

## E.  ABDEL-SAYED's Continued Operation of Unauthorized Classes and Sale of Unauthorized Certificates to Undercover Investigators

24.  From my participation in the investigation,
discussions with NYS-OIG investigators, and review of recordings
prepared by NYS-OIG investigators, among other things, I have
learned that, in or about January 2017, based on a referral from
CUNY, NYS-OIG commenced an investigation into the Unauthorized
Courses offered by MAMDOUH ABDEL-SAYED, the defendant.  The
investigation, in part, involved the introduction of undercover
investigators ("UC-1" and "UC-2") who posed as students in order
to attend ABDEL-SAYED's Unauthorized Courses and purchase
Unauthorized Certificates from him.  Through this investigation,
UC-1 and UC-2 both purchased multiple Unauthorized Certificates
from ABDEL-SAYED, as described below.

25.  In connection with this undercover operation, UC-
1 recorded multiple telephone conversations with MAMDOUH ABDEL-
SAYED, the defendant, and Assistant-1 regarding ABDEL-SAYED's
course offerings.  I have reviewed recordings of these phone
calls, and from them I have learned, for example, that in early
February 2017, Assistant-1 informed UC-1, in substance and in
part, that ABDEL-SAYED taught a Sonogram course at the College
scheduled to begin on February 17, 2017, and that would last 8
to 10 weeks; that the class would cost "$1,000 with a $20
registration fee" and could be paid by "cash or money order";
and that students had to be enrolled in CUNY to attend the class
because otherwise students would have difficulty gaining access
to the building.  Assistant-1 also informed UC-1 that ABDEL-
SAYED additionally had a three-course offering covering CPR, EKG
and Phlebotomy, scheduled for February 10, 2017 at the College.
ABDEL-SAYED later informed UC-1 that each of these courses were

free, but a certificate for demonstrating completion of the CPR, EKG, and Phlebotomy courses cost $25 each.

26.    Based on my participation in this investigation, I have learned that, on February 10, 2017, in connection with this undercover operation, UC-1 and UC-2 paid MAMDOUH ABDEL-SAYED, the defendant, to obtain several Unauthorized Certificates from him.  Each certificate purportedly represented that it had been issued by the College, and ABDEL-SAYED stated that these certificates would help students obtain employment. These transactions were consensually recorded by UC-1 and UC-2. More specifically:

e.    UC-1 and UC-2 separately went to a classroom at the College to attend ABDEL-SAYED's EKG Class.  At the beginning of the class, ABDEL-SAYED entered and exited the room on several occasions, often asking students if they either had trouble with security or if security had come to the room.

f.    After having been informed that security had not come by the classroom, ABDEL-SAYED began a lecture on EKGs. UC-1 recorded the class.  During the lecture, ABDEL-SAYED stated, in relevant part: "Once you finish this program we give you a certificate.  The certificate has your name and date.  The certificate says that you took the training with me and you can perform EKG.  So we do that.  All the [staffing] agencies, I'm giving you them, can hire you if they have an opening."  About an hour later, at the conclusion of the lecture and a brief demonstration of an EKG exam on two students, ABDEL-SAYED informed students who wanted their certificates to follow him to his office at the College.

g.    UC-1 and UC-2 were part of a group of students that followed ABDEL-SAYED to his office.  During this meeting, UC-1 and UC-2 each purchased from ABDEL-SAYED Unauthorized Certificates representing that UC-1 and UC-2 had completed certain of the Unauthorized Courses.  In particular, UC-1 purchased three certificates from ABDEL-SAYED – one each for a training program in EKG, CPR, and Phlebotomy; and UC-2 purchased two certificates from SAYED – one each for a training program in EKG and Phlebotomy.  The total for the five course certificates was $125 ($25 each), which UC-1 and UC-2 provided to ABDEL-SAYED in the form of three postal money orders.  UC-1 did not attend any lectures on CPR and Phlebotomy at that time, despite purchasing Unauthorized Certificates that ABDEL-SAYED signed representing UC-1 had successfully completed training in CPR and Phlebotomy.  Similarly, UC-2 did not attend any lectures

16

on Phlebotomy at that time, despite purchasing an Unauthorized
Certificate stating UC-2 had completed training in that subject.

27.    Based on my participation in this investigation,
including my review of recordings made by UC-1 and UC-2 and my
discussions with UC-1 and UC-2, I have learned that, from in or
around March 2017 to May 2017, UC-1 paid $900 to MAMDOUH ABDEL-
SAYED, the defendant, and Assistant-1 in exchange for an
Unauthorized Certificate purporting to show that UC-1 had
completed a course in performing Sonogram exams.  In particular:

a.    On March 17, 2017, UC-1 attended ABDEL-
SAYED's Sonogram class, which was held at a laboratory classroom
at the College.  UC-1 consensually recorded the class.  When UC-
1 entered the classroom, it was already in progress.  UC-1
previously had stated to ABDEL-SAYED that UC-1 wanted to attend
the Sonogram class, and ABDEL-SAYED had informed UC-1 that he
offered the class every Friday.  During the class, ABDEL-SAYED
informed UC-1 that UC-1 had not missed much by not attending the
first several Sonogram classes, and that "at the end [of the
course], we give you a certificate and we help you to get the
license also."  During this class (as well as others UC-1
attended), ABDEL-SAYED never informed UC-1 about a syllabus,
textbook or any mechanism for grading.

b.    On March 20, 2017, UC-1 purchased a $900
postal money order in Manhattan and mailed it to ABDEL-SAYED
from New York, New York to ABDEL-SAYED's Office at the College
for payment of ABDEL-SAYED's unauthorized Sonogram class.  On
March 24, 2017, UC-1 confirmed with ABDEL-SAYED and Assistant-1
that ABDEL-SAYED had received the money order for $900.  On that
date, Assistant-1 also informed UC-1 that the Sonogram class
cost an additional $120.

c.    On March 30, 2017, UC-1 met ABDEL-SAYED in
his Office at the College, and UC-1 paid ABDEL-SAYED the
remaining balance for the unauthorized Sonogram class with
another postal money order.  During this meeting, ABDEL-SAYED
informed UC-1 that after UC-1 obtained the Sonogram certificate
at the end of the course, UC-1 would be able to obtain
employment through Staffing Company-1.  In addition, ABDEL-SAYED
provided UC-1 with a letter of recommendation, which UC-1 had
requested, to assist UC-1 in obtaining an internship.  The
letter stated that UC-1 was attending "the clinical sonography
class with me [ABDEL-SAYED] in MEC/CUNY," and had previously
completed training in EKG and Phlebotomy.  The letter was on
Medgar Evers College letterhead, and ABDEL-SAYED identified

himself on the letter as "Professor of clinical sonography MEC/CUNY," and embossed and signed the letter.  Based on my participation in this investigation, I have learned that ABDEL-SAYED is not a professor of clinical sonography at the College.

        d.    On April 7, 2017, UC-1 met ABDEL-SAYED in order to obtain a proof of registration for the unauthorized Sonogram class from him.  Later, UC-1 met Assistant-1 in ABDEL-SAYED's Office and obtained a registration form from her. Assistant-1 also informed UC-1 that UC-1 should consider going to the hiring agencies ABDEL-SAYED had posted in his office, and Assistant-1 provided UC-1 with a pamphlet for a commission that purported to provide health care certificates in Yonkers, New York (the "Commission").[4]  Assistant-1 informed UC-1 that the Commission charged $70 for a preview test, and that it then cost about $200 to take the state board examination offered by the Commission.  (Based on my participation in this investigation, there is in fact no state board examination regarding clinical sonography offered by the Commission or any other agency.) Assistant-1 also encouraged UC-1 to take the "preview" examination with ABDEL-SAYED, and that after UC-1 obtained the Sonogram certificate from ABDEL-SAYED, UC-1 would be qualified to take the test with the Commission.  Assistant-1 also stated that ABDEL-SAYED's classes are a "bargain," and UC-1 should take advantage of it.

        e.    On April 21, 2017, UC-1 attended ABDEL-SAYED's unauthorized Sonogram class at a laboratory room at Medgar Evers College.  During the class, which UC-1 recorded, ABDEL-SAYED informed the students that he would provide them with the Sonogram certificate for the course without the students having to take any test, but in order to obtain "the license you [students] have to go for the test" at the Commission.  ABDEL-SAYED also informed the students that he had a contact at the Commission, so his students should not "worry about" the test, because ABDEL-SAYED had a "good deal with him."

        f.    On May 5, 2017, UC-1 met ABDEL-SAYED in his Office at the College.  UC-1 consensually recorded this meeting. UC-1 informed ABDEL-SAYED that UC-1 wanted to get "the PCT

---

[4] Based on my participation in the investigation and review of the Commission's website, I have learned that the Commission advertises that it is the "first and oldest general allied health professional certifying organization" and has "educated, certified and assisted thousands of allied health professionals."

[Patient Care Technician] certificate," which, as previously mentioned, typically would be obtained from Medgar Evers College after a 200-hour course costing $2,530.  ABDEL-SAYED then created a certificate on his computer that stated UC-1 had successfully completed a program in PCT and printed it out for UC-1 in exchange for $35 in cash.  UC-1 never enrolled in any classes prior to obtaining the certificate.  UC-1 also inquired about when to expect the Sonogram certificate, and ABDEL-SAYED stated that UC-1 would have to wait and that the Sonogram certificate was "more fancy because it was more expensive."

g.    On May 12, 2017, UC-1 attended one of ABDEL-SAYED's Sonogram classes at a laboratory room at the College. UC-1 recorded the class.  Upon entering the classroom, ABDEL-SAYED provided UC-1 with a folder filled with papers.  ABDEL-SAYED informed UC-1 that the papers were a hand out and two exams, and "that when you go home, you see this stuff at the top [of the exam] just dark it because it is illegal to have."  The top of the exams referred to "National Certifying Examination" for "Sonogram" and "Paramedical Associate" and "National Paramedical."  During the class, two female students spoke to the other students in class and told the students that they needed "to protect Sayed," and follow ABDEL-SAYED's instructions, because ABDEL-SAYED was providing his course at a large discount as it typically costs thousands of dollars for the Sonogram course, rather than the $1,000 charged by ABDEL-SAYED.  Assistant-1 agreed and told the students that they should "take advantage of it."  During the class, Assistant-1 also informed UC-1 that it would be another two weeks before UC-1 received the Sonogram certificate, but once UC-1 received it, UC-1 should present it to the Commission in order to take a test with "the state board," to get "the certificate from the state."[5]

---

[5] I am aware, based on my review of recordings made by UC-2, that also on or about May 12, 2017, UC-2 met ABDEL-SAYED in his Office at the College for the purposes of obtaining a PCT certificate and to discuss employment opportunities.  During the meeting, which UC-2 recorded, ABDEL-SAYED told UC-2 that UC-2 should be able to get a job through Staffing Company-1, and that his former students previously had obtained jobs through Staffing Company-1.  UC-2 asked for a PCT certificate, and ABDEL-SAYED printed out a certificate for UC-2 in exchange for $50 in cash.  The certificate represented that UC-2 had successfully completed a program in PCT, despite the fact that UC-2 had never attended any PCT classes.  ABDEL-SAYED also stated that if UC-2 was interested in his upcoming Sonogram

h.   On May 25, 2017, UC-1 met ABDEL-SAYED in his Office to obtain an Unauthorized Certificate for the Sonogram course.  During the meeting, which UC-1 recorded, ABDEL-SAYED printed two copies of an Unauthorized Certificate for the Sonogram course for UC-1, and SAYED also provided UC-1 his College business card.  While in ABDEL-SAYED's Office, UC-1 overheard a telephone call on ABDEL-SAYED's speakerphone from a caller who identified herself as an incoming freshman at the College who was interested in ABDEL-SAYED's PCT and Medical Assistant class.  ABDEL-SAYED informed the caller that "the class is free" but that the caller would have to "pay" $50 for a certificate of completion for the classes, adding that the fee was a bargain since the "class outside" would "cost[] you a lot of money."

### E.   ABDEL-SAYED's Attempts To Cover-Up and Obstruct Justice

28.   From my participation in the investigation, discussions with NYS-OIG investigators, and review of recordings prepared by NYS-OIG investigators, I have learned that after MAMDOUH ABDEL-SAYED, the defendant, became aware of the federal criminal investigation, he made efforts to cover-up his crimes and conceal evidence of them, as follows:

a.   On or about June 26, 2017, I and other agents with ED-OIG and NYS-OIG participated in a judicially-authorized search of ABDEL-SAYED's Office at the College. ABDEL-SAYED was present for the search.  As part of the search, agents recovered blank copies of Unauthorized Certificates, an embosser that he used to affix a seal to those certificates (which seal bore ABDEL-SAYED's name and name of the College), and other materials related to the Unauthorized Courses.

b.   On or about July 8, 2017, UC-1 received a voicemail from ABDEL-SAYED that stated, among other things, that he had a "big problem" with ACE, that UC-1 should not attend the review program at the Commission, and that UC-1 should bring the Unauthorized Certificate back to Assistant-1 and that Assistant-1 would give UC-1 a refund.

c.   On or about July 11, 2017, UC-1 called ABDEL-SAYED in response to his voicemail.  During the call,

---

class in June and July that UC-2 should contact Assistant-1, who handled logistics for the class.

which UC-1 recorded, ABDEL-SAYED stated he had a problem with
the College, that there were students "betraying" him and
complaining to the College, and that the College wanted him to
suspend "the program."  ABDEL-SAYED also asked if UC-1 had found
any jobs with the Unauthorized Certificate, and that if UC-1 had
an internship, then UC-1 might be able to continue to use the
certificate.  ABDEL-SAYED further informed UC-1 during the call
that UC-1 either could keep the certificate or return it for a
refund.  On the call, ABDEL-SAYED stated that the Sonogram
course he offered cost $4,000 from other providers.  At the end
of the call, UC-1 arranged to meet ABDEL-SAYED and Assistant-1
at ABDEL SAYED's office at the College.

          d.    On or about July 13, 2017, ABDEL-SAYED and
UC-1 met at ABDEL-SAYED's office.  During the meeting, which UC-
1 recorded, ABDEL-SAYED asked UC-1 to return the Unauthorized
Certificate for the Sonogram course that ABDEL-SAYED had
provided to UC-1.  UC-1 asked whether the EKG certificate that
UC-1 had received from ABDEL-SAYED also needed to be returned.
ABDEL-SAYED and Assistant-1 explained that they only needed the
Sonogram certificate because, according to ABDEL-SAYED, it was
"different."  At the meeting, ABDEL-SAYED and Assistant-1 also
repeatedly told UC-1 not to talk to law enforcement, with ABDEL-
SAYED urging UC-1 to "take the fifth," which, based on my
training and experience, is a reference to invoking the Fifth
Amendment.  ABDEL-SAYED and Assistant-1 asked UC-1 to return on
the following Monday with the Sonogram certificate and receipt
issued by Assistant-1 for the Sonogram course.

          e.    On or about July 17, 2017, ABDEL-SAYED
called UC-1.  Earlier that day, UC-1 had met with Assistant-1,
during which meeting Assistant-1 had again told UC-1 not to
speak with law enforcement and to assert UC-1's Fifth Amendment
rights.  During UC-1's call with ABDEL-SAYED, which UC-1
recorded, UC-1 stated that law enforcement agents had approached
UC-1 regarding ABDEL-SAYED.  ABDEL-SAYED told UC-1 that UC-1
should tell law enforcement that UC-1 took Pathophysiology with
ABDEL-SAYED, which was a course that ABDEL-SAYED was authorized
by the College to teach, but which ABDEL-SAYED knew was not a
course that UC-1 had attended.  On the call, ABDEL-SAYED
requested another meeting with UC-1, which meeting never
occurred.  After the telephone call, ABDEL-SAYED attempted to
contact UC-1 on several additional occasions.

WHEREFORE, deponent respectfully requests that a warrant be issued for the arrest of MAMDOUH ABDEL-SAYED, the defendant, and that he be arrested and imprisoned or bailed, as the case may be.

VICTORIA CRESSMAN
Special Agent
Office of the Inspector General –
Department of Education

Sworn to before me this
28th day of September, 2017

THE HONORABLE JAMES L. COTT
UNITED STATES MAGISTRATE JUDGE
SOUTHERN DISTRICT OF NEW YORK

EXHIBIT A

